### DOHERTY v. DUBBS.
Patent Appeal No. 3160.

Court of Customs and Patent Appeals.
May 20, 1933.

Edmund G. Borden, of New York City (Stone, Boyden, Mack & Hahn, of Washington, D. C., and Kenneth I. White, of New York City, of counsel), for appellant.

Charles M. Thomas and James P. Burns, both of Washington, D. C., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

An interference was declared in the United States Patent Office between the application for patent of the appellant, Henry L. Doherty, filed February 24, 1920, and a patent to the appellee, Carbon P. Dubbs, No. 1,623,236, application for which was filed October 8, 1921.

The subject-matter of the interference is an improvement in process and apparatus for oil cracking. As originally framed, the interference consisted of four counts, these being claims 5, 6, 8, and 11 of the Dubbs patent, which patent was issued on May 10, 1927.

After the declaration of the interference, the party Dubbs filed a motion to dissolve the interference on the ground that the counts of the interference did not read upon the Doherty disclosure. The Law Examiner held that the motion to dissolve should be granted as to counts 1 and 3, and denied the same as to counts 2 and 4, which said counts now constitute the counts of this interference, and are claims 6 and 11 of the Dubbs patent.

On appeal to the Board of Appeals, the said decision of the Law Examiner was affirmed. There was also sought to be added

in said interference, on the part of Doherty, a count copied from claim 10 of the Dubbs patent. The motion to amend by the insertion of this claim 10 was also denied by the Law Examiner, and this action was affirmed by the Board of Appeals.

Thereupon the matter came on to be heard before the Examiner of Interferences, who, after considering the case upon the record, neither party having taken testimony, awarded priority of the subject matter in issue to Doherty, the senior party. Involved in the interference were certain motions to strike certain proffered patents from the record, and certain portions of counsel for Doherty's brief. Both motions were denied.

On appeal to the Board of Appeals, the party Dubbs insisted upon his original motion that the interference should be dissolved, contending that the counts did not read upon Doherty's disclosure. This was made possible by rule 130 of the Patent Office, which provides that any such question "may be raised before the appellate tribunals on appeal from the award of priority."

In support of his contentions, the party Dubbs filed an extensive brief with the Board of Appeals, a part of which the party Doherty moved to strike, as raising new points not theretofore urged in the proceeding. The Board of Appeals was of opinion that the various motions to strike should be denied, holding that each brief involved matters which were properly before the board for consideration.

The Board of Appeals was of the opinion, and so held, that the counts of the interference, "when read in the light of the disclosures of Dubbs' patent and when interpreted according to the accepted rules of interpretation, are not readable on Doherty's disclosures," and reversed the decision of the Examiner of Interferences, awarding priority to the junior party Dubbs. From this decision, Doherty has appealed to this court.

The counts of the interference are as follows:

"1. An oil converting process consisting in heating oil to a cracking temperature while passing in a restricted stream through a heating zone, in collecting an enlarged body of such oil in a reaction zone where said oil undergoes conversion, and in aiding in the conversion of the oil in the enlarged reaction zone by the introducing heated incondensible gases from the process to said zone to commingle with the oil body therein without substantially raising the transfer temperature of the oil introduced to such enlarged zone, and in maintaining a superatmospheric pressure on the oil undergoing conversion.

"2. The process of treating hydrocarbon oil, consisting in heating a stream of oil to a conversion temperature, in transferring the heated oil constituents to an enlarged reaction zone where a body of liquid oil is maintained, in which zone conversion of oil occurs, in introducing into the body of liquid oil maintained in said enlarged zone gases produced in the process under pressure to promote the reaction of the oil therein and to keep the carbon in suspension in the residual oil, in withdrawing the products of conversion from said reaction zone, and in maintaining a superatmospheric pressure on the oil stream and the body of oil in said enlarged reaction zone."

The disclosure of Dubbs' patent is an oil-cracking system which operates substantially as follows: Raw oil is introduced into the top of a dephlegmator and flows downwardly therethrough in an opposed direction to ascending oil vapors, which vapors are refluxed by coming in intimate contact with the incoming cool raw oil. The oil and condensate is drawn off through the bottom of the dephlegmator, and passes, by means of a pump and valve, to a heating coil mounted in a furnace, wherein the oil is raised to a cracking temperature. From this heating coil it passes to a large vaporizing chamber where it is collected and permitted to vaporize "in a substantial body." There is a residuum draw-off line near the bottom of this vaporizing chamber, by which the products of condensation are drawn off as desired. The vapors generated in the vaporizing chamber pass through a pipe into the bottom of the dephlegmator hereinbefore described, where they rise, as has been stated. The uncondensed vapors pass from the top of the dephlegmator to a water condenser, where they are collected and conducted, as distillate, to a receiver. The incondensible gas which is collected in the top of the receiver is drawn off through a pipe line, is conducted from thence to a separate heating coil, heated, and thence conducted to the bottom of the vaporizing chamber, where it is caused to enter in such a manner as to cause it to bubble up through the liquid contained in said vaporizing chamber. It is stated that: "The heated gas bubbling up through the oil body has a peculiar chemical effect, which besides promoting the vaporization of the oil produces a better quality and more uniform distillate in the receiver."

Doherty's disclosure is, substantially, as follows:

Raw oil, which may be kerosene, gas oil, fuel oil, or a mixture of two or more of these, is supplied to the system through a pipe by a pump, and is carried through a series of surface condensers, in heat-transferring relationship, with oil vapors, which are passing through the system, by means of which the oil is preheated by the vapors to 300°–450° F. This heated oil then enters the top of what is denominated a "cracking chamber," which consists of a tower-shaped chamber containing a number of horizontally placed perforated trays, one above the other. The oil flows down through these various trays to the bottom of said chamber. When the oil has reached a median point in the chamber, it meets a flow of heated oil which is introduced through a pipe, and which comes from a so-called settling chamber. The said settling chamber is in direct communication with the heating coils of the cracking furnace, and in said settling chamber condensation occurs, the condensate being drawn off and out of the system from a point above the bottom thereof, by means of a pipe. Vapors which are not condensed accumulate in the top of said settling chamber, and pass from thence through a pipe into the bottom of the cracking tower, in which the trays are situated, and from that point rise through the oil contained in said "cracking chamber" bubbling through the holes in the several trays. A certain amount of condensation occurs in said "cracking chamber." This condensate is drawn from said chamber at a point above the bottom thereof through a pipe, and returns to the cracking furnace, through which it is again circulated. Heavier residue from this "cracking chamber" collects in the bottom thereof, and is drawn out of the system by another pipe. The uncondensed gases from the "cracking chamber" rise through a reflux condenser mounted at the top of the "cracking chamber," and then pass through a series of surface, fractional condensers, and finally into a water cooled condenser where the lowest boiling-point hydrocarbons are condensed. The uncondensed gases then pass into an oil scrubber, where they are treated with thin oil to remove the uncondensed vapors, and the gases are drawn off from the top of said scrubber, where they collect, and are pumped back into the circulating system through a pipe, which also conveys the liquids drawn from near the bottom of the "cracking chamber," and from which point, mixed with said liquids, they are conducted back into the coils within the cracking furnace.

Count 1 of the interference has, for the first step in its process, the heating of oil to a cracking temperature while passing in a restricted stream through a heating zone. It is stated by appellant, in his brief, that the ordinary cracking temperature ranges from about 700° to 900° F. Doherty's specification, as we have seen, recites that the raw oil which enters his so-called "cracking chamber" is preheated to from 300° to 450° F., before so entering. In this "cracking chamber" it is mixed with oil which has gone through the cracking furnace, and this mixture of raw oil and superheated oil flows downward over the trays.

It does not appear to the court that this is passing the raw oil in a restricted stream through a heating zone, in which it is heated to a cracking temperature.

On the contrary, however, Dubbs shows this to be accomplished by passing his raw material directly through a dephlegmator into the heating coils of his furnace, where the entire body thereof is heated to a true cracking temperature.

Again the count recites, " * *. * collecting an enlarged body of such oil in a reaction zone, where said oil undergoes conversion." In our opinion, the passing of Doherty's mixture of oils over and through the trays in the tower is not collecting an enlarged body of *such* oil. "Such" must necessarily refer to raw oil which has been previously thereto heated by passing in a restricted stream through a heating zone.

The count also calls for collecting an enlarged body of *the* oil. This is not done by Doherty's tower and its trays, but is done by the Dubbs vapor chamber.

Again, the count speaks of the conversion of *the* oil in the large reaction zone, by introducing incondensible gases resulting from the process, directly into the body of oil contained in such reaction zone. To our minds, this means the collection of the whole of the oil to be treated, in a large body, and that the incondensible gases which are a result of the complete cracking operation, shall be forced through the body of oil in this chamber, to aid in the cracking process.

Dubbs plainly shows this method. The incondensible gases which he uses are those which result from the complete operation. On the contrary, Doherty shows no such process. The gas which he uses in his cracking tower cannot be said to be incondensible, but

is the result of a combination of the incondensible gases remaining after the complete distillation process, mixed with distillate from the tower, all of which has again passed through the heating furnace, and has passed through the settling chamber. When it is delivered to Doherty's tower, it must necessarily contain therein products of the process which render the gas not incondensible.

Nor are we of opinion that causing such gas to rise through the trays of Doherty's tower is the equivalent of the requirement of the count, viz., that it be incondensible gases from the process which shall be introduced into *the* oil in the enlarged reaction zone.

To our mind, while to some extent the operation may be similar in the two cases, it is obvious that in many essential respects the processes are quite distinct and different.

The Board of Appeals has also called attention to the fact that the count requires that all of the oil heated in the heating zone pass into the reaction zone, and that Doherty shows a different process. Assuming that the tower containing trays is his reaction zone, all of the oil does not pass thereinto, but the tar and carbon is drawn off from the bottom of the settling chamber before it reaches such reaction zone. This seems quite apparent, from an examination of Doherty's specification and drawings.

■ We are of opinion count 1 does not read upon Doherty's disclosure.

As to count 2, substantially the same suggestions are applicable, and nothing can be added which might be helpful. We are likewise of the opinion that count 2 also is not readable on Doherty's disclosure.

■ The appellant complains that the Board of Appeals did not strike from the record certain portions of the Dubbs brief on appeal. It is alleged that Dubbs, on appeal to the Board of Appeals, argued matters relative to the motion to dissolve which were not argued when the motion was originally made before the Law Examiner.

We have examined said brief and are unable to see wherein the said brief was in violation of the rules of the Patent Office, or contrary to the right which the party Dubbs had to point out wherein the counts of the interference did not read on Doherty's disclosure. That matter was a matter for the Board of Appeals to determine, and anything which might aid toward that end was permissible, and within the discretion of the board to receive and consider.

■ A suggestion of diminution of the record was made by the party Dubbs herein, and, as a result thereof, the writ of certiorari was issued and the United States Patent Office certified additional matters of record. These matters have to do, in the main, with a patent to Dubbs, No. 1,627,159, and an application of Dubbs, filed January 27, 1917, together with certain amendments and other formal matters in connection therewith. These were relied upon, to some extent, by Dubbs, as supporting his claim to an earlier date of conception and reduction to practice than that claimed by the party Doherty. It is now suggested that these matters were unnecessary to a decision of this case, and that the costs thereof should be taxed against the party Dubbs. In view of our conclusions herein, we are of opinion that this point is well taken, and it is ordered that the costs of printing said additional transcript of record shall be taxed against the party Dubbs.

The decision of the Board of Appeals is affirmed.

Affirmed.